# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

SHANNON LEE DI GIUSEPPE,

        Petitioner,

                                  CASE NO: 07-CV-15240

-vs-

                                    PAUL D. BORMAN

MICHAEL ANTHONY DI GIUSEPPE,      UNITED STATES DISTRICT JUDGE

        Respondent.

_____/

## OPINION AND ORDER DENYING PETITIONER'S MOTION FOR RETURN OF CHILDREN

Before the Court is Petitioner Shannon Lee Di Giuseppe's December 12, 2007 Petition for Return of Children. (Dkt. No. 1). On December 28, 2007, Respondent Michael Anthony Di Giuseppe ("Respondent") responded. (Dkt. No. 2). A hearing on the Motion was held on March 19 and 20, 2008. The Court rendered its opinion from the bench, holding Petitioner's Motion for Return of Children be **DENIED**.

## I.     BACKGROUND

This case arises from Petitioner's allegation that Respondent is wrongfully retaining their three minor children in Michigan. (Pet. ¶ 6). Petitioner is a Canadian citizen and currently resides in Calgary, Alberta, Canada. (*Id*. ¶ 8). Respondent is a Canadian citizen who is now a legal resident of the United States of America. (*Id*. ¶ 9). He currently resides in Hamburg, Michigan. (*Id*.).

Petitioner and Respondent were married on November 18, 1995 in Ontario, Canada. (*Id*. ¶ 12). They were separated in March, 1998. (*Id*. ¶ 14). Three children were born of this marriage. (*Id*. ¶ 10). On October 2, 1998, the Ontario Court entered an Order granting Petitioner sole custody of the children; Respondent limited access pursuant to certain conditions; and ordering Respondent

to pay $300.00 in spousal support and $589.00 in child support per month. (*Id.* ¶ 17, Ex. B, Order). On November 12, 1999, a Divorce Decree was entered at the request of Petitioner. (*Id.* 19). Respondent did not participate in any of the divorce proceedings, or the proceedings to determine custodial rights he contends he never received notice of the petitions. (*Id.* ¶¶ 15, 19; Resp. ¶¶ 16, 19).

The three children are: B.M. Di Giuseppe, 12 -years-old; C.L. Di Giuseppe, 11-years-old; and N.R. Di Giuseppe, 10-years-old.[1] (Pet. ¶ 10). All of the children lived in Canada until August, 2007. (*Id.* ¶ 11).

Petitioner claims that in 2001, C.L., then five-years-old, informed Petitioner that he was sexually abused by her previous live-in boyfriend's 12-year-old daughter. (*Id.* ¶ 22). Respondent disputes this account and claims Petitioner was aware of the abuse and allowed it to continue before she chose to take the allegations seriously. (Resp. ¶¶ 21-22).

In 2003, Petitioner became aware that C.L. may have exhibited inappropriate sexual behavior towards his younger sister, N.R., and claims she took specific action to stop the behavior. (Pet. ¶ 24). Respondent alleges Petitioner did not take any preventative action on her own accord, but was directed to do so by Sarnia-Lambton Children's Aid Society ("CAS"). (Resp. ¶ 24, Ex. 1 & 2, Report of CAS and Psychological Profile of C.L.). It is undisputed that N.R. lived with Respondent for two months, and C.L. lived with Respondent for one month after N.R. was returned to Petitioner. (Pet. ¶ 24). C.L was then sent to Children and Parent Resource Institute ("CPRI"), a children's mental health hospital. (*Id.*). In the fall of 2004, C.L was discharged by CPRI and directed to live with Respondent for six months. (*Id.*). After six months, C.L. returned to live with Petitioner and

---

[1] Initials are used to protect the names of the juvenile children.

his siblings. (*Id*.).

Petitioner and the children resided together in Ontario, Canada from the spring of 1998, until they relocated to Raymond, Alberta, Canada in 2005. (*Id*. ¶ 14). After moving, Petitioner notified Respondent of the relocation. (*Id*. ¶ 28). When Petitioner and the minor children first moved to Raymond, Alberta, Canada, in 2005, the family lived with Petitioner's parents. (*Id*. ¶ 27). Petitioner and the children moved into their own home six months after their initial relocation. (*Id*. ¶ 29).

In early 2006, Petitioner and the children relocated to a four-bedroom house in Calgary, Alberta, Canada after Petitioner earned a promotion with the Newalta Corporation. (*Id*. ¶¶ 31-32). Respondent contends the house is in fact a two bedroom house which did not provide adequate sleeping quarters. (Resp. ¶ 32). Respondent also asserts that Petitioner relocated from Ontario to Alberta to escape CAS jurisdiction. (*Id*. ¶ 33).

Petitioner claims she contacted Alberta Child and Family Services ("ACFS") to explain her living conditions and to inform them that she had previously been in contact with CAS while living in Ontario. (Pet. ¶ 33). A caseworker from ACFS inspected Petitioner's home, spoke with the previous caseworker in Ontario, and decided not to open a file on Petitioner and the children. Petitioner was informed by the ACFS caseworker that her CAS file was being closed. (*Id*. ¶¶ 33-34). Respondent argues that CAS in Ontario was never contacted by ACFS and the CAS file was eventually closed because Petitioner moved out of its jurisdiction. (Resp. ¶ 33).

The three children visited Respondent for one month during the summer of 2006. (Pet. ¶ 35). Respondent returned the children to Petitioner and they attended school in Calgary during the 2006-2007 academic year. (*Id*. ¶¶ 35-36).

In the spring of 2006, Petitioner and Respondent agreed that the three children would visit

Respondent for July and August of 2007. (*Id*. ¶¶ 39-40). Petitioner alleges she instructed Respondent to place the three children in continued therapy while visiting Michigan so they would not "regress." (*Id*. ¶ 41). Respondent contends Petitioner never suggested counseling, and the decision to do was totally his. (Resp. ¶ 41). The children did receive counseling in Michigan.

After the children's arrival in Michigan in 2007, Petitioner and Respondent agreed that B.M. and C.L. would stay with Respondent for the 2007-2008 academic year. (Pet. ¶ 43). N.R. was to return to Calgary at the end of August, 2007. (*Id*.).

In the middle of August 2007, Petitioner reconsidered her previous agreement and "demanded" that Respondent return all the children at the end of August 2007. (*Id*. ¶ 45).

On August 29, 2007, Respondent contacted Petitioner and informed her that he would not return the three children to Canada, but would seek custody of the three children through court order in Michigan state court. (*Id*. ¶ 48). Petitioner alleges that she contacted the Royal Canadian Mounted Police and the Michigan State Police in an effort to regain custody of her children. (*Id*. ¶¶ 49-50). Petitioner alleges that she then attempted to drive to Michigan, but before arriving was warned by Respondent that he had obtained an emergency court order from a Michigan court and she would be arrested if she attempted to take the children. (*Id*. ¶ 51). Respondent denies ever making this claim. (Resp. ¶¶ 51-52).

Respondent sought temporary physical and legal custody through an emergency petition in the Livingston County Circuit Court, Family Division on August 28, 2007. (Pet. ¶ 52, Ex. D, Emergency Petition). On August 31, 2007, the Circuit Court granted temporary jurisdiction over the petition and set a hearing for September 7, 2007. (*Id*. ¶ 52). The Circuit Court subsequently determined that it lacked jurisdiction over the action. (*Id*.).

Respondent alleges that he decided to pursue sole custody because he became aware of the "repeated abuse and neglect" of the children by Petitioner and felt that children would be in danger if returned to her. (Resp. ¶ 47).

On September 21, 2007, the Court of Queen's Bench for Alberta adopted the previous October 2, 1998 Order by the Ontario Court and confirmed that Petitioner was the sole custodial parent of the three minor children. (Pet. ¶ 54, Ex. F, 9/21/07 Order).

On December 12, 2007, Petitioner filed the instant Petition.

## II. ANALYSIS

### A. Legal Standards

The Hague Convention on Civil Aspects of International Child Abduction ("the Convention"), as implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601, *et. seq*. controls in the instant case. *See* Hague Convention on Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49, (*reprinted at* 51 FR 10494 (Mar. 26, 1986)). Both Canada and the United States are signatories to the Convention.

"When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to considered." *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007) (citing Hague Convention, art. 19). Pursuant to the Convention, removing a child from one country to another is considered "wrongful" when:

> (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention;

5

and

(b)   at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3.

The party seeking the return of the children bears the initial burden of establishing that the children were wrongfully removed from the country of their habitual residence. 42 U.S.C. § 11603(e)(1)(a and b). The respondent then has certain defenses he may assert pursuant to Articles 12, 13, and 20 of the Convention.

### A.   Wrongful Removal

Respondent concedes that the children's habitual residence is Canada and Petitioner has exercised her custodial rights. Therefore, there is no issue regarding whether the children were "wrongfully removed" under the Convention.

### B.   Affirmative Defenses

Respondent asserts that although he has wrongfully removed the three minor children from their habitual residence, Alberta, Canada, two separate affirmative defenses – grave harm, and children's preference – exist under the Convention which mandate that in this case the Court not grant the Petition to return the children.

#### 1.   Grave Harm

Article 13 of the Convention states in relevant part:

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that

> –
>
> . . . .
>
> (b)  there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.
>
> . . . .
>
> In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

The respondent has the burden of showing the above exception by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(a). This exception is to be construed narrowly by courts "lest it swallow the rule." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (citation omitted).

Respondent contends that the three minor children should not be returned to Canada and Petitioner because to do so would put them at grave risk for physical and psychological harm.

As the Sixth Circuit Court of Appeals has made clear, "the exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence." *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996) ("*Friedrich II*"). The Sixth Circuit also noted,

> Although it is not necessary to resolve the present appeal, we believe that a grave risk of harm for the purposes of the Convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute – *e.g.*, returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Id*. at 1070.

The Sixth Circuit recently confronted the issue of what level of abuse or neglect constitutes a "grave risk" under Article 13(b) of the Convention; *Simcox v. Simcox*, 511 F.3d 594 (6th Cir. 2007). In *Simcox*, Mrs. Simcox took her four children in the middle of the night from their home in Mexico and relocated to Ohio. *Id*. at 598-600. Mrs. Simcox alleged that her husband was abusive to her and the children and that the children should not be returned to Mexico pursuant to Article 13(b) of the Convention. *Id*.

The district court determined that "Mr. Simcox was both verbally and physically violent with his wife and children." *Id*. at 599. Yet, the district court went on to conclude that the threshold of grave risk was not met because,

> Mrs. Simcox had provided evidence of a *serious* risk of harm due to abuse and emotional dependence, [but it] could only consider that evidence directly establishing the existence of a *grave* risk that would expose the child to physical or emotional harm or otherwise place the child in an *intolerable* situation.

*Id*. at 600 (internal quotations omitted). The district court also imposed certain "undertakings" which would ameliorate the danger to the children's safety during the interim between their return to Mexico and the determination of custody of the Mexican courts. *Id*. at 601. Mrs. Simcox appealed the district court's order arguing, in relevant part, that the district court misinterpreted Article 13(b) of the Convention. *Id*. at 602.

The Sixth Circuit held that, "while all jurists would agree that *some* level of domestic abuse will trigger the Article 13(b) exception, the more difficult question is at precisely what level will return expose the child to a '*grave* risk' of harm or place the child in an '*intolerable* situation'". *Id*. at 605 (emphases in original). The Court further recognized that "courts that have confronted abusive situations tend to refuse to order the return of the children, at least were the abuse could be

8

characterized as very serious." *Id*. Most importantly the Sixth Circuit set forth a framework under which to examine this issue:

> First, there are cases in which the abuse is relatively minor. In such cases it is unlikely that the risk of harm caused by the return of the child will rise to the level of a "*grave* risk" or otherwise place the child in an "*intolerable* situation" under Article 13(b) . . . . Second, at the other end of the spectrum, there are cases in which the risk of harm is clearly grave, such as where there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect. . . . Third, there are those cases that fall somewhere in the middle, where the abuse is substantially more than minor, but is less obviously intolerable. Whether in these cases, the return of the child would subject it to a "grave risk" of harm or otherwise place it in an "intolerable situation" is a fact-intensive inquiry that depends on carful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return.

*Id*. at 607. In *Simcox*, the Sixth Circuit ultimately reversed the district court and held that the "grave risk" threshold had been met where the nature of the abuse was serious, happened with "extreme frequency", and there was a "reasonable likelihood that it will occur again absent sufficient protection". *Id*. at 609.

In the instant case, Respondent argues that the minor children should not be returned to Petitioner such that a Canadian court can determine custody. Respondent relies upon a recent report from a treating counselor for the three children and her testimony in court to support his allegations that the children are in grave physical and emotional danger due to the fact that Petitioner is physically abusive, Petitioner does not provide adequate mental health treatment for the children, and she leaves the younger two children in the care of B.M. who is "mentally ill". (Resp. Br., Ex. 6, Counselor's Report at 1). The report also states that "[t]he mother can not provide the structure, intensive supervision, or implementation of behavioral plans that it takes five adults to accomplish

9

now. The children will not be safe, the children's behaviors will regress and decompensate, and their actions and cognitions' will be met with physical abuse." (*Id.*). Also attached to the therapist's report is the referral to child protective services which includes statements from each child detailing the physical abuse at the hands of Petitioner. (*Id.* at 3-4).

Petitioner argues that the children have been unduly influenced by Respondent and the physical abuse allegations are untrue. Petitioner notes that the children never made these allegations previously and submits the treatment notes from previous therapists. (Pet. Reply Ex. C, Treatment Notes). Further, Petitioner requested that the Court examine the children *in camera*, or appoint an independent professional to speak with the children to determine to "accurately determine" their testimony. The Court did examine the three children *in camera*.

There are two very different versions of events presented to the Court. Petitioner alleges that she was a model mother who went out of her way to protect her children and provide them therapy and Respondent was an absentee father who had little to do with their lives until recently. Respondent argues that he has recently become aware that Petitioner is abusive, neglectful and has gone so far as to move from Sarnia to Calgary to escape the jurisdiction of Canadian child services because of fear her children would be taken from her. Respondent argues that any therapy the children received while in her care was sporadic and the result of the ACS and not of Petitioner's maternal instinct.

Relevant to this issue is the history of previous sexual abuse of one of the minor children, as well as the resulting sexualized behavior of C.L. and N.R. and the diagnosed mental disorder (childhood schizophrenia) of B.M. There was also testimony that two of the children had threatened suicide or had ideations of suicide. This circumstance leads the Michigan therapist to note that the

children will be in immediate peril if transferred to Petitioner's care because of a lack of structure, therapy, and supervision.

The Court notes that Petitioner admitted while on the stand that she "only" uses corporal punishment, and only spanking, against her children approximately two or three times a month and only when all other measures fail. The Court finds this abusive and excessive. Petitioner then went on to explain that she had also slapped her children with an open hand across the face hard enough to leave marks and on one occasion hard enough to result in a child hitting his head on a cupboard and drawing blood. Petitioner also admits she was called to school when her daughter was accused of biting and another child, and her response was to <u>bite her own daughter</u> in front of the school officials as a form of discipline. Petitioner also admits that CAS became involved with her family after she slapped <u>one</u> of her children across the face and left marks. Thus, while Petitioner argued that her children's allegations of abuse were unfounded and influenced by their father – she went on to corroborate them all.

The Court conducted *in camera* interviews with each of the children (neither parent nor the therapist was present). The Court finds that all three children are mature and testified truthfully that: Petitioner was abusive; they were justifiably extremely frightened of Petitioner and/or her behavior; and they did not want to return to Canada and reside with her.

In light of the testimony from Petitioner and the children in addition to the therapist's report, the Court finds that Respondent has met the clear and convincing evidentiary burden of Article 13(b). The Court finds that this abuse and neglect constitutes a "grave risk" of harm and creates an "intolerable situation." It appears from the record and testimony that the abuse was frequent, extreme and there exists a likelihood, no a certainty, that it would reoccur, before a Canadian court

could determine the custody issue.

To the extent Petitioner argues against the children's veracity, this claim is undercut by the explanation by the children; that they purposely did not make claims against their mother because they feared they would be put in foster care, they deserved to be beaten, or they feared their mother going to jail. (Ex. C., at 3-4). After examining the children, the Court finds the children's testimony to be uncoerced, unprepared, and truthful, that they all justifiably fear the slappings and beating and irrational harmful behavior of Petitioner.

Alternatively, the Court also denies the Petition for Return of Children because all three children, B.M., C.L., and N.R., have expressed that they oppose the return and having observed and spoken with them, the Court finds they have reached an age and maturity such that the Court should consider their opinion. *See* discussion *infra*.

### 2. Children's Preference

Pursuant to Article 13:

> The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

The Respondent has the burden of proving this defense by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(b). "Although courts have construed this exception narrowly, a court may refuse repatriation *solely* on the basis of a considered objection to returning by a sufficiently mature child." *De Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007). Further,

> In applying the "age and maturity" exception, a court must not focus solely on the general goal of the Convention -- to protect children from the harmful effects of wrongful removal -- but must also carefully determine that the particular child "'has obtained an age and degree of maturity at which it is appropriate to take account of its views.'" The Convention contains no age limit for applying the exception, and if

> a court determines that the youngster's opinion is the product of undue influence, the child's wishes are not taken into account.

*Id*. (internal citations omitted).

In the instant action, Respondent contends all three children, ages 12, 11 and 10-years-old, object to being returned to Petitioner and wish to stay in Michigan and continue living with him. Petitioner argues that because the children have also told her in previous phone conversations that they wish to return home to her and she has had limited contact with them, the children's wishes should not be determinative of the issue. (Pet. ¶ 44).

Whether a child has reached the age and maturity is a fact specific inquiry. *Simcox*, 511 U.S. at 604; (citing *De Silva*, 481 F.3d at 1287). Therefore, speaking with the minor children is imperative to this decision, to determine whether they are sufficiently "mature" and also to determine if there are any improper outside influences at work.

As stated previously, the Court has conducted *in camera* interviews with each child, separate from each other, as well as without either parent, or their attorneys, or the therapist in the courtroom. The Court was impressed by each child's self-presence and poise. Each child articulated that they did not wish to return to Canada and the reason for their choice: safety. The Court does not find that the children's testimony was wrongly influenced by Respondent or that they were instructed in how to answer.

The Court also agrees with each of the children that Respondent provides a safe and healthy environment to the children, and also adults in the residence who can monitor the children which is especially important in this case given the children's history. Further, Respondent has initiated and continued intensive therapy for the children with a therapist that all the children expressed they trusted and liked.

In light of these findings, the Court holds that all three of the children have demonstrated a maturity for their age which enables this Court to give weight to their opinion as to whether they object to being returned to Petitioner or Canada.

The children have requested that they remain with their father. The Court will accede to their requests.

### III. CONCLUSION

For these reasons, the Court **DENIES** Petitioner's Petitioner for Return of Children.

**SO ORDERED**.

    s/Paul D. Borman
    PAUL D. BORMAN
    UNITED STATES DISTRICT JUDGE

Dated: April 11, 2008

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 11, 2008.

    s/Denise Goodine
    Case Manager